Katherine Meyer
Director, Animal Law & Policy Clinic
Harvard Law School
1585 Massachusetts Ave.
Cambridge, MA 02138
DDC Bar No. 244301
(617) 998-2450 (o)
(202) 257-5145 (c)
kmeyer@law.harvard.edu
*Applicant for Pro Hac Vice admission forthcoming*

Tanya Sanerib
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
DDC Bar No. 473506
(206) 379-7363 (c)
tsanerib@biologicaldiversity.org
*Applicant for Pro Hac Vice*

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| Center for Biological Diversity,<br><br>Plaintiff<br><br>v.<br><br>United States Fish and Wildlife Service,<br><br>Defendant. | Civil Action No.:<br><br>Complaint for Declaratory and Injunctive Relief |

**INTRODUCTION**

1. Plaintiff Center for Biological Diversity ("the Center") brings this case under the Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 *et seq.*, to compel the United States Fish and Wildlife Service ("FWS" or "the Service") to disclose years of

information it has collected concerning the import and export of wildlife and plants—many of which are extremely imperiled species.

2. Each year, the United States allows the import of hundreds of millions of wildlife and plant specimens from around the world. These imports include everything from python-skin boots, to aquarium fish and turtles destined for the pet trade, to corals, orchids, bones, skulls, and shells used for home decor, to lions and elephants killed as hunting "trophies," as well as zoo and scientific specimens.

3. Biodiversity loss is being driven in part by human exploitation of wildlife and plants, with the United States playing a significant role. Many wildlife and plant imports are sourced from the wild, and some are extremely rare and imperiled species. For example, the United States remains the world's largest importer of corals despite a precipitous decline in wild coral populations—it imported over 691,000 specimens in 2014. Between 2006 and 2015, the United States imported 21,402 giraffe-bone carvings, 3,008 giraffe-skin pieces and 3,744 giraffe hunting trophies—with giraffe bone increasingly being used as an ivory substitute for knife and gun handles.

4. Likewise, in the midst of a pandemic of likely zoonotic or wildlife origin, wildlife trade fuels interactions that risk new pathogens infecting people. For example, between 2010-2014, the United States imported almost 23 million whole animals, parts, samples and products made from bats, primates and rodents—animals that harbor 75% of known zoonotic viruses.

5. The United States likewise exports a massive volume of wildlife and wildlife specimens. More than 17 million freshwater turtles were exported from the United States between 2011 and 2015, most of which were consumed as food or medicine in Asian markets. Every year, around 80,000 bobcats, river otters, gray wolves, Canada lynx, and brown bears are killed, and their furs are commercially exported from the United States to supply the international fur trade. These extreme collection and exportation practices have already been linked to population declines in several species.

6. Trade is the second largest threat to wildlife species, after habitat destruction. The United States is one of the largest markets for wildlife products in the world.

7. For wildlife specimens to be imported into or exported from the United States, the specimens must be cleared by the Service, regardless of whether the imported or exported specimen is intended for commercial trade, scientific research, breeding, education, exhibition, personal use, or as a hunting trophy. 50 C.F.R. § 14.52 *but see id.* § 14.55 (listing exemptions). To facilitate clearance, importers and exporters must submit a wildlife declaration (USFWS Form 3-177) that reports basic data including, *inter alia*, (1) the date and purpose of the import or export; (2) the species name, country of origin, and quantity of specimens imported or exported; (3) the port of import or export; and (4) the names of importers, exporters, and carriers. *Id*. §§ 14.61, 14.63.

8. All this information is recorded by the importer or exporter on the wildlife declaration, USFWS Form 3-177. The Service inputs data from the wildlife declarations into its Law Enforcement Management Information Systems ("LEMIS") database, which also states whether the Service cleared or refused the import or export for entry.

9. These data are used by the public, including conservation and environmental organizations, to track which species of wildlife the Service allows to enter and leave the United States, from where, by and to whom, and in what quantity, in order to analyze which species may be most affected by trade; to seek international and domestic protections for such species as needed; monitor illegal trade; and to determine whether the United States and other countries are meeting legal obligations such as trade quotas.

10. The LEMIS data are also used by journalists to promote public knowledge about the impacts of trade on species and the environment, and by scientists to research and write about the impacts of trade on species, to study diseases and their emergence, and to research the laundering and trafficking of wildlife.

11. Similarly, export data are used to track trade in species that originated in the United States and to ensure compliance by exporters with all legal obligations.

12. Without the customarily provided LEMIS data, the public cannot identify which species are being traded, where they are coming from or going to, and for what purpose—all of which impairs efforts to seek effective protections for affected species. Given the significant role of U.S. demand for wildlife and plants and their products and that the United States is the only country globally that tracks in detail all wildlife crossing its borders, the LEMIS data are globally unique and critical to the conservation of species.

13. For years, the Service routinely released data from its LEMIS database to the public when requested under FOIA, providing, among other information, quantity, names of foreign and U.S. importers and exporters, country of origin, and other details.

14. However, more recently, the Service has failed to disclose any LEMIS data.

15. The agency is now allowing submitters of the information to object to disclosure of LEMIS data on the ground that this information is exempt from disclosure under Exemption 4 of FOIA, which protects "trade secrets" and "confidential commercial information." 5 U.S.C. § 552(b)(4). But despite its solicitation of such objections, the Service still has not released any of the LEMIS data since 2016.

16. The Service's failure to make this critical information publicly available greatly impairs the Center's ability to carry out its work to conserve and protect foreign species. Accordingly, the Center seeks an order compelling prompt disclosure of the information.

## JURISDICTION AND VENUE

17. Jurisdiction over this action is conferred by FOIA, 5 U.S.C. § 552(a)(4)(B).

18. Venue is proper in the District of Arizona pursuant to 5 U.S.C. § 552(a)(4)(B), because the Center has its principal place of business in this judicial district.

19. Assignment of this case to the Tucson Division of this Court is appropriate because Plaintiff has its principal place of business in Pima County. Local Rule 77.1(a), (c).

## PARTIES

20. Plaintiff Center for Biological Diversity ("the Center") is a 501(c)(3) non-profit conservation organization with over 89,000 members. Its headquarters are in Tucson, Arizona, and it maintains several other offices across the country and in Mexico. Through science, policy, and environmental law, the Center advocates for the protection of threatened, endangered, and rare species and their habitats throughout the United States and abroad. The Center's International Program specifically focuses on protecting foreign imperiled species, including from unsustainable commercial trade and on raising awareness regarding the risk of disease to humans from wildlife exploitation.

21. The Center is the requester of the information at issue. The organization and its members are harmed by the Service's failure to disclose the information that is responsive to the Center's FOIA Requests. This violation of law precludes the Center from understanding the type, quantity, purpose, and other important information about wildlife and plant imports and exports that the Service allows into and out of the United States.

22. Import and export information is critical to the Center and its International Program's operations. Center staff use the data to: (a) track which species are being used most in trade; (b) determine the volume of trade in particular species in order to evaluate whether trade is a threat to the conservation of a particular species; (c) ascertain the purpose of commercial trade—including, for example, whether trade is for medicinal, decorative, fashion, or pet and aquarium purposes; (d) determine the country of origin of the species; and (e) for other purposes. This information and the Center's subsequent analyses of it help to inform and prioritize the Center's organizational strategy, including determining which species may require additional study, scientific research, advocacy for domestic and international protections, and increased public education.

23. The Center collects, distills, and distributes the data to keep its members and the public in general informed about the need for critical species protection and the impacts of the U.S. market on wildlife. The Center further depends on the data when

producing reports, petitions, and other educational and advocacy documents that detail for its members and the public the impact of wildlife trade on specific species, as well as the impact on human and wildlife health. The Center also relies on LEMIS data to inform Congressional representatives and their staffs about the need to develop and enact legislation monitoring and restricting wildlife trade.

24. The Center's interests and activities are adversely affected by the Service's failure to disclose the requested LEMIS data. This injury will be redressed if the Court orders the Service to disclose the requested records.

25. Defendant United States Fish and Wildlife Service ("the Service") is a federal governmental agency within the meaning of FOIA, 5 U.S.C. § 552(f)(1), and has possession and control of the records at issue.

## STATUTORY FRAMEWORK AND
## FACTS GIVING RISE TO PLAINTIFF'S CLAIM

**A.     The Freedom of Information Act**

26. The Freedom of Information Act ("FOIA") ensures both an open government and government accountability through transparency. FOIA requires that "each agency, upon any request for records . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3).

27. To ensure prompt disclosure of information, FOIA imposes strict deadlines on federal agencies for responding to FOIA requests. Specifically, upon receiving a FOIA request, an agency has 20 working days to respond to the request. 5 U.S.C. § 552(a)(6)(A)(i). A requester may file an administrative appeal of an agency's failure to disclose requested records, and an agency must make a determination on any such appeal within 20 working days. *Id.* § 552(a)(6)(A)(ii). A requester is deemed to have exhausted its administrative remedies and may seek immediate judicial review of the matter if the agency fails to comply with any of these statutory deadlines. *Id.* § 552(a)(6)(C)(i).

28. Under FOIA, an agency may withhold information only if it qualifies under one of nine narrowly-construed statutory exemptions. 5 U.S.C. § 552(b)(1)–(9). The

agency bears the burden of proving that the information qualifies for an exemption and may therefore be lawfully withheld. *Id.* § 552(a)(4)(B). If the agency determines that a portion of a responsive record is exempt from disclosure, the agency must nonetheless disclose "[a]ny reasonably segregable portion" of the record after redacting the exempt information, and the agency must explain why the redacted portions were withheld. *Id.* § 552(b).

29. Under FOIA Exemption 4, an agency may withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).

30. Information that is not a trade secret is not considered "confidential" within the meaning of FOIA Exemption 4 unless the government can demonstrate that the information is commercial and both customarily and actually treated as confidential by the submitter, and the information was submitted to the agency pursuant to an assurance that it would not be publicly disclosed. *Food Mktg. Inst. v. Argus Leader Media*, -- U.S. --, 139 S. Ct. 2356, 2366, 204 L. Ed. 2d 742 (2019).

**B.     The LEMIS Data**

31. Pursuant to the Service's authority under several statutes that govern and restrict importation of wildlife into the United States—including the ESA, the Lacey Act, 16 U.S.C. §§ 3371-3378, 18 U.S.C. § 42, the Migratory Bird Treaty Act, 16 U.S.C. §§ 703-712, the African Elephant Conservation Act, 16 U.S.C. §§ 4201-4246, and the Wild Bird Conservation Act, 16 U.S.C. §§ 4901-4916—the Service's regulations require that a Service officer "must clear all wildlife imported into the United States prior to release from detention by Customs officers," with limited exemptions. 50 C.F.R. §§ 14.52(a), 14.55.

32. To facilitate clearance, importers and exporters must submit a wildlife declaration form (Form 3-177) that reports specific data, including, *inter alia*, (a) the date and purpose of the import or export; (b) the species name, country of origin, and quantity of specimens imported or exported; (c) relevant permit and document numbers that apply

to the import; and (d) the names of importers, exporters, and carriers involved in the import or export. 50 C.F.R. §§ 14.61, 14.63.

33. The Service then inputs data from these declarations into the LEMIS database. The agency also denotes in the database whether the Service cleared or refused the import for entry or the export for exit and if not, whether the item was confiscated or abandoned.

34. Some wildlife and plant species are also subject to import and export prohibitions, restrictions, or permitting requirements imposed by various statutes. For example, the ESA prohibits the importation of all endangered and many threatened-listed species, although the Service may grant import permits for "scientific purposes" or to "enhance the species' propagation or survival." 16 U.S.C. §§ 1538(a), 1539(a)(1)(A); 50 C.F.R. § 17.31. Section 10 of the ESA requires the Service to publish notice and seek public comment on each such endangered species import permit application, 16 U.S.C. § 1539(a), and Section 10 also states that all information received by the Service as part of such an application "shall be available to the public as a matter of public record at every stage of the proceeding." *Id*. § 1539(c).

35. Pursuant to the requirements of Section 10, the Service routinely discloses to the public importer/exporter names, quantity, country of origin, location of wild capture or breeder name and location, and shipping details for live specimens, as well as the full permit application and any granted permit.

36. In addition, the United States is also a Party to the Convention on International Trade in Endangered Species of Fauna and Flora ("CITES"). 27 U.S.T. 1087, 993 U.N.T.S. 243, and additional import and export prohibitions, restrictions, and permitting requirements apply to species listed under the CITES. *Id*.; 16 U.S.C. § 1538(c).

37. CITES requires all Parties to maintain detailed records of trade in CITES specimens, including the names and addresses of exporters and importers, quantity of wildlife traded, and other information. CITES, art. VIII ¶ 6. Parties must submit to the CITES Secretariat an annual report summarizing those records. CITES, art. VIII ¶ 7(a).

The Secretariat then publishes some of these data on its publicly accessible CITES Trade Database.

38. Additionally, with some exceptions, vessels that enter the United States must submit a manifest to the U.S. Customs and Border Patrol ("CBP"), including a cargo declaration. 19 U.S.C. § 1431(a); 19 C.F.R. § 4.7(a). Vessel cargo information is compiled daily in CBP's Automated Manifest System ("AMS") and "is available to interested members of the public on CD-ROM"—including vessel name, arrival date, description of goods, manifest quantity, manifest units, piece count, weight, bill of lading number, and the importer's name and address, unless the importer expressly seeks confidential treatment of its name and address through a regulatory process. 19 C.F.R. § 103.31(e). AMS data released to the public regularly contain names of importers, quantity, and carrier names.

39. Accredited members of the press are also permitted to examine vessel manifests, 19 C.F.R. § 103.31(a)(3), and private sector media services then make the data available to the public for a fee. For example, the Journal of Commerce's Port Import Export Reporting Service ("PIERS") collects and analyzes U.S. seaborne imports from vessel manifest documents.

**C.     The Center's FOIA Requests**

40. On January 31, 2019, the Center submitted a FOIA Request to the U.S. Fish and Wildlife Service for LEMIS data generated between January 1, 2016, through December 31, 2018. Specifically, the Center sought access to the information recorded in the following LEMIS database columns:

(a) Control number,
(b) Species name (including species code, genus, species, subspecies, specific name, and generic name),
(c) Wildlife description,
(d) Quantity/unit/number of cartons,
(e) Country of origin,

(f) Country of import/export,

(g) Purpose code,

(h) Source code,

(i) Action (cleared or refused),

(j) Disposition,

(k) Date of import/export,

(l) Whether specimen is an import or export,

(m) Port,

(n) Transport mode,

(o) U.S. importer/exporter name, and

(p) Foreign importer/exporter name.

41. When the Center did not receive a response to this request as required by FOIA, by letter dated July 11, 2021, it sent the agency an appeal of the constructive denial of its January 31, 2019, request.

42. On April 2, 2020, the Center submitted an additional FOIA request to the Service for the same categories of LEMIS data generated between January 1, 2019, and December 31, 2019.

43. On February 4, 2021, the Center submitted another FOIA request to the Service for the same categories of LEMIS data generated between January 1, 2020, and December 31, 2020.

44. Although the statutory timeframe for responding to these FOIA requests has long since expired, the Service still has not provided Plaintiff with a substantive response to its requests, nor has it provided Plaintiff with any of the requested information.

45. In May 2021, the Service issued notice to submitters of the wildlife declaration forms from which the LEMIS data are generated, allowing the submitters to

object to the disclosure of the LEMIS data requested by the Center and other requesters pursuant to Exemption 4 of FOIA. That notice required submitters to file their objections with the agency by no later than June 11, 2021.

46. The Center still has not been provided with any of the LEMIS data it requested under FOIA.

47. Prior to 2013, the Service routinely released all LEMIS data including quantity, country of origin, and foreign importer/exporter name data to requesters through FOIA.

48. The Service did not provide importers and exporters an assurance of confidentiality when it collected the information at issue in this case. On the contrary, the version of Form 3-177 that was used for some of the data informs these individuals that the information collected "may be subject to disclosure under the Freedom of Information Act," and a newer version of Form 3-177, that applies to some of the other information at issue, similarly states that the collected information is "used to respond to requests under the Freedom of Information Act."

## PLAINTIFF'S CLAIM FOR RELIEF

49. Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

50. Plaintiff has a statutory right of access to the LEMIS data it requested under FOIA, and there is no lawful basis for Defendant's withholding of this information.

51. The Service's failure to disclose the LEMIS data responsive to the Center's FOIA Requests violates FOIA, 5 U.S.C. § 552(a)(3), and injures Plaintiff in the manner described herein.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief:

(1) Declare that Defendant's failure to provide the requested records violates FOIA, 5 U.S.C. § 552(a)(3);

(2)     Order Defendant to promptly provide Plaintiff with all information that is responsive to its FOIA Requests;

(3)     Award Plaintiff its attorneys' fees and litigation expenses pursuant to 5 U.S.C. § 552(a)(4)(E); and

(4)     Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Tanya Sanerib
Tanya Sanerib
Center for Biological Diversity
2400 NW 80th Street, #146
Seattle, WA 98117
DDC Bar No. 473506
(206) 379-7363 (c)
tsanerib@biologicaldiversity.org
*Applicant for Pro Hac Vice*

Katherine Meyer
Director, Animal Law & Policy Clinic
Harvard Law School
D.C. Bar No. 244301
1585 Massachusetts Ave.
Cambridge, MA 02138
(617) 998-2450 (o)
(202) 257-5145 (c)
kmeyer@law.harvard.edu
*Application for pro hac vice admission forthcoming*

*Attorneys for Plaintiffs*